UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


AGILYSYS, INC.,               )        Case No.: 1:06 CV 1665
                            )
       Plaintiff            )        JUDGE SOLOMON OLIVER, JR.
                            )
       v.                )
                            )
KEITH GORDON, *et al.*,       )
                            )
       Defendants         )        <u>ORDER</u>


      This action arises from Plaintiff Agilysys, Inc.'s ("Plaintiff" or "Agilysys") acquisition of

The CTS Corporations ("CTS"). Plaintiff asserts the following claims against Defendants Keith M.

Gordon ("Gordon"), Michael Malone ("Malone"), and Bryan Krohn ("Krohn") (collectively,

"Defendants"), former CTS officers:[1] (1) breach of contract and/or representations and warranties;

(2) fraud; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) unjust enrichment; (6)

civil conspiracy; (7) aiding and abetting fraud; (8) conversion;[2] (9) declaratory judgment; and (10)

---

[1]    Plaintiff originally filed suit against DecisionPoint International, LLC ("DecisionPoint") and John Nash ("Nash"). However, Plaintiff subsequently filed a Joint Stipulation of Dismissal of Claims Against DecisionPoint and Nash on December 28, 2007, pursuant to Federal Rule of Civil Procedure 41(a). (ECF No. 76.)

[2]    Plaintiff indicates that the parties have stipulated to the dismissal of the conversion claim. (Pl.'s Opp'n to Mot. for Summ. J. at 13, n.13.) Accordingly, Defendants' Motion for Summary Judgment with respect to this claim is moot. However, Plaintiff still seeks to recover

rescission. (Pl.'s Compl. ¶¶ 56-111.)  Defendants subsequently filed several counterclaims against

Plaintiff, among them the Earn-Out Counterclaim upon which Plaintiff seeks Partial Summary

Judgment.

Now pending before the court are: (1) Defendants' Motion for Summary Judgment (ECF No.

86); (2) Plaintiff's Motion for Summary Judgment on the Earn-Out Counterclaim (ECF No. 88); (3)

Plaintiff's First and Second Motions to Strike Portions of the Declarations of Defendants Malone

and Gordon (ECF Nos. 95, 124); and (4) Defendants' Motion for Leave to File *Instanter* Corrected

Exhibit to Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.  Facts

<u>1. The Parties</u>

Agilysys is a publicly-traded Ohio corporation in the business of reselling enterprise

computer technology solutions and delivering complex servers, software, storage, and services to

end-user customers in a variety of industries.  (ECF 88, Ex. 1, Aff. of Curtis Stout ("Stout Aff.") at

¶ 3.)  Agilysys acquired CTS, a Georgia-based, privately-held company that was in the business of

providing professional support services to or on behalf of a variety of customers, most notably EMC

Corporation ("EMC").  As an EMC subcontractor, CTS provided computer-related support services

to EMC's end-user customers that was referred to as "pass through" or "indirect" business.  (Gordon

Dep. at 24.)  Defendant Gordon was CEO of CTS, Defendant Malone was President, and Defendant

Krohn was its CFO.  (ECF 87 at 2.)  All three Defendants, among others, were shareholders of CTS

---

the $90,000 that Malone allegedly fraudulently charged to his company credit card pursuant
to Plaintiff's unjust enrichment claim.

and received their proportionate share of the price Plaintiff paid to acquire CTS.  (Malone Dep. at 31-33.)

<u>2. Plaintiff's Acquisition of CTS</u>

Plaintiff received an unsolicited Offering Memorandum for the sale of CTS in August 2004. (Ex. 3, Aff. of Martin Ellis ("Ellis Aff."), Agilysys Treasurer and CFO, ¶ 3.)  In the Offering Memo, CTS touted its highly profitable relationship with EMC, indicated that EMC accounted for almost 82% of CTS's revenues, and further projected that CTS's 2005 revenues from EMC would grow 10% over those for 2004.  (Offering Memo at 1, 7.)

At the first meeting between Plaintiff and CTS in November 2004, the CTS representatives confirmed the information set forth in the Offering Memo, touted the solid relationship between CTS and EMC, and emphasized that the subcontracting work from EMC was "the majority" of CTS's business.  (Ellis Dep. at 62; Dep. of Robert J. Bailey, Agilysys Executive Vice-President ("Bailey Dep." at 49.))  When asked about CTS's dependence on EMC, Malone specifically stated that EMC "could not replace" CTS even if it wanted to, and assured Plaintiff that CTS's business was going to grow and prosper.  (Bailey Dep. at 49-53.)  Based on these representations and the financial information provided by CTS, Plaintiff decided to invest resources in negotiating an Indication of Interest with CTS and engage in due diligence.  (Ellis Aff. ¶ 4.)

In January of 2005, Gordon, Malone and Nash made a formal presentation to Plaintiff's executive committee, which included Chairman and CEO Arthur Rhein, Bailey, Ellis and others ("January 2005 meeting") (Ellis Dep. at 82.)  Gordon and Malone again emphasized the stability of CTS's relationship with EMC.  (Rhein Dep. at 30-34; Ellis Dep. at 88-92.)  Based on CTS's representations, Plaintiff continued to pursue the relationship, and a final Indication of Interest was

signed in early February that outlined the contours of the Acquisition.  (Ellis Dep. at 88-92.) Plaintiff maintains that it would not have acquired CTS on any terms if it had any indication that its subcontracting business with EMC was going to measurably degrade. (Ellis Dep. at 173-75.) While Plaintiff was interested in CTS based on its profitable relationship with EMC, Defendants were interested in Agilysys as a merger partner based upon its much-touted sales force, which Defendants believed would push CTS's sales even higher.  (Gordon Decl. ¶ 10.)

The merger was approved in late April of 2005 by Plaintiff's Board of Directors, and the parties executed an Agreement and Plan of Merger (the "Agreement") on May 9, 2005.  (Agreement, ECF No. 88, Ex. 1 at Ex. A.)  Under the Agreement, Plaintiff was to pay an initial cash price of $25 million.  The Agreement also provided that CTS shareholders, who included Defendants, were eligible for additional, contingent compensation in the form of an earn-out payment that could reach $32 million. (Agreement, 2.8.1.)  Gordon maintains that this large potential payment that was substantially in excess of the initial cash price caused CTS's major shareholder to take less money up front because CTS anticipated it could readily meet or exceed the earn-out threshold.  (Gordon Decl. ¶ 11.)

The parties' Agreement contained a number of Representations and Warranties that assured Plaintiff that the information CTS provided during the course of negotiations and due diligence was complete and accurate.  (Agreement at  § 4, 6, 7.)  Additionally, the Agreement provided that the Representations and Warranties made by CTS were accurate not only at the time that they were made, but also as of the time of closing.  (Agreement § 6.1(c).)  Finally, CTS covenanted that it would promptly inform Plaintiff in the event that it became aware of any information at any time prior to closing that would indicate the existence of a material breach of any of the Representations

-4-

or Warranties.  (Agreement § 7.3.)

The parties' Agreement also contained a representation assuring CTS that the information Plaintiff supplied to CTS was "true, correct, and complete in all material respects" and that it "accurately represent[ed], in all material respects, the financial position of [Agilysys's Professional Services Group] at the dates specified and the results of [the group's] operations for periods covered thereby."  (Agreement, Section 5.8).  Plaintiff also promised that, for purposes of determining the earn-out threshold, that it would not allocate to CTS any "corporate overhead [or] intercompany charges" or charge to CTS "any expenses relating to personnel changes" absent CTS's agreement. (Agreement, Section 2.8.2(b) and (c)).

As part of the acquisition, Plaintiff executed separate Employment Agreements with Malone and Gordon, who would become executives of the newly-merged business, which was referred to as Agilysys Professional Services ("APS"). (ECF 88, Ex. 1 at Exs. B&C, Gordon and Malone's Employment Agreements, respectively.)   According to the Employment Agreements, Gordon and Malon were to "have full latitude to manage [APS] on behalf of Agilysys, absent gross or willful misconduct and subject to reasonable supervision and oversight by Agilysys management." (Employment Agreements ¶ 2.)  Gordon and Malone, pursuant to the Employment Agreements, promised to use their best efforts in Plaintiff's interest.  (Employment Agreements ¶ 3.) The Employment Agreements further provided that Gordon or Malone could be terminated for cause "for any act of fraud or embezzlement against Agilysys or in connection with" their responsibilities as Agilysys employees.  ( Employment Agreements ¶ 5.A.)

The Merger closed on May 31, 2005.  Agilysys paid $25 million in cash and $3 million in assumed debt.

### 3. Post-Acquisition Events

Almost immediately after closing, Plaintiff asserts that the legacy CTS business, which constituted revenue from EMC subcontracting, dropped off precipitously, and the decline by the end of September 2005 was staggering. (Rhein Dep. at 119, 122.) Unable to identify the reasons for the losses, the Agilysys executive committee asked Gordon to attend a regularly-scheduled meeting on October 10, 2005 ("October 2005 meeting"). (Rhein Dep. at 120.)

At that meeting, Plaintiff asserts that, when Rhein asked Gordon what happened to the EMC subcontracting business, Gordon admitted that he was not surprised that the EMC subcontracting business had decreased, he was only surprised at how quickly the business dropped off. (Rhein Dep. at 169; Dep. of Kathryn Vanderwist, former Agilysys in-house counsel ("Vanderwist Dep.") at 172-73.) Plaintiff maintains that Gordon further admitted that EMC had "switched and gone in a different direction" and was providing more services itself and relying less on subcontractors. (Vanderwist Dep. at 176.) Finally, Plaintiff states that Gordon admitted that EMC had instituted these changes in early 2004, although CTS failed to inform anyone at Agilysys of this information prior to closing or that EMC's subcontracting business was at risk. (Rhein Dep. at 169, 179-81; Ellis Aff. ¶ 8; Ellis Dep. at 177. ) However, Gordon maintains that he was referring only to a decrease in pass-through revenue from EMC's Commercial Division, which constituted only 18% of CTS's service revenues and is not the subject of Plaintiff's Complaint, and was not referring to revenue decline in the TME division, which accounted for 52% of service revenue. (Defs.' Reply at 11, citing Sadowski Reply Decl. ¶ 6, Ex. D, at 3-4; Ex. F at 170-173, 177, 182-83.)

After the October 2005 meeting, Plaintiff states that it contacted EMC to inquire about the change in its business model, what it had told CTS about it, and when. (Dep. of James Livingston,

"Livingston Dep.," EMC 30(b)(6) representative, at 63-65, Ex. 127.)  Plaintiff maintains that EMC advised Agilysys that it had decided to reduce its use of subcontractors in early 2004 and soon thereafter communicated its plan to CTS and other service partners.  (Livingston Dep. at 63-65; Bailey Dep. at 210-13.)  Plaintiff asserts that EMC confirmed this information again at its 30(b)(6) deposition.  (Livingston Dep. at 36, 44-49, 63-65.)  Moreover, Plaintiff states that former CTS employees and at least one other EMC service partner also verified that EMC made a decision to reduce its use of subcontractors in 2004, informed its service partners of that decision, and began to implement its plan.  (Ex. 12, Dep. of James Toole at 94-96; Dep. of John Orr at 38-40, 55, 57.) Conversely, Defendants maintain that Plaintiff was not damaged as a result of Defendants' failure to disclose the alleged EMC Loss to Plaintiff because the volume of EMC's pass-through business with other service providers increased rather than decreased after the acquisition.  (EMC Summary; EMC Payment Records.)  Essentially, the thrust of Defendants' argument is that if Agilysys failed to capture a substantial portion of EMC business, such a result is not attributable to CTS, but rather to Agilysys itself.

Agilysys also maintains that it learned after the closing that some of CTS's accounts receivable had been contested by EMC prior to the closing, but CTS failed to disclose that knowledge to Plaintiff.  (Krohn Dep. at 75, 76, 89.)  Plaintiff asserts that, during due diligence, Krohn admits he did not disclose the contest of the accounts receivable, and Plaintiff ultimately wrote off $160,000 of an invoice to Daticon as an uncollectible bad debt.  (ECF 87 at 8-9, Krohn Dep. at 74.)  However, Krohn asserts that Plaintiff made no attempt to collect the Daticon invoice and wrote it off under its inflexible policy of expensing as a bad debt any invoice that is more than 90 days past due, even though the invoice was collectible.  (Krohn Decl. ¶¶ 5, 8.)  Thus, Krohn

contends that Plaintiff wrote off a collectible invoice rather than making an effort to collect it.  (*Id.*)

Plaintiff terminated Gordon's employment at the end of October 2005, shortly after the executive meeting.  (ECF 87 at 8.)  Malone continued to work for Plaintiff until January of 2006. Plaintiff asserts that Malone admitted that he charged personal expenses on his company credit card, including airline tickets for friends and entertainment for Forest Lorick, his anticipated future business partner. (Malone Dep. at 274-87.)  Plaintiff subsequently fired Malone based on his alleged complicity in the fraud, his unacceptable performance, and because he misused his company credit card.

Defendants' Counterclaim alleges that Plaintiff impeded CTS's operations, failed to educate and incentivize its sales force, and misrepresented its financial information.  (Defs.' Counterclaim ¶¶ 13-44.)  As a result of these failures, Gordon and Malone allege that they did not meet the profit threshold for the earn-out payment that was part of the Agreement.  (*Id.* ¶ 14..)

### B.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in

most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil,* 188 F.3d 365, 369 (6th Cir. 1999).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

### C. Law and Analysis

Defendants seek summary judgment on all ten counts of Plaintiff's Complaint, and Plaintiff seeks partial summary judgment on Count One of Defendants' Counterclaim ("the Earn-Out Counterclaim"). For the following reasons, the court denies Defendants' Motion for Summary

Judgment.  The court grants in part and denies in part Plaintiff's Partial Summary Judgment Motion on the Earn-Out Counterclaim.

<u>1. Defendants' Motion for Summary Judgment</u>

*a. Count One (in part)*

Count One of Plaintiff's Complaint alleges that Defendants breached the contract and/or representations and warranties in part by not disclosing to Plaintiff its alleged knowledge of the EMC Loss.[3]  The Sixth Circuit has recognized that "[u]nder Ohio law, the elements of a breach of contract are: (1) that a contract existed; (2) that the plaintiff fulfilled his obligations; (3) that the defendant unlawfully failed to fulfill his obligations; and (4) that damages resulted from this failure." *Mikulski v. Centerior Energy Corp.,* 501 F.3d 555, 561 n.3 (6th Cir. 2008) (citation omitted).

Defendants argue there is no genuine issue of material fact regarding the element of causation, and that judgment should be rendered in their favor as a matter of law.  Specifically, Defendants maintain that Plaintiff cannot show a causal link between Defendants' alleged breach and Plaintiff's alleged injury because the volume of EMC's subcontracting business with other service providers allegedly increased rather than decreased after the acquisition.  In support of this contention, Defendants offer a letter from Edward Little, EMC's counsel, that attaches a one-page Summary of Annual Revenue Paid to EMC's Service Providers for Work Performed 2004-2006 ("EMC Summary") (Defs.' Summ. J. Mot., Sadowski Decl., Ex. A.).  Moreover, Defendants

---

[3]     Plaintiff's breach of contract claim is primarily based upon the fact that Defendants allegedly failed to disclose the EMC loss, and this allegation is discussed in this section.  However, Plaintiff also bases its breach of contract claim in part upon its allegation that Defendants falsely represented that certain of CTS's accounts receivable were collectible.  The court addresses this ancillary allegation below in Section I(C)(1)(c).

introduce documents that EMC agreed to produce, after motion practice in the United States District Court of Massachusetts and on appeal to the First Circuit, showing each payment that EMC made to its service partners in 2004, 2005, and 2006 ("EMC Payment Records").  Defendants assert that, after extracting EMC's payment to service providers outside the United States, the EMC Payment Records show payments to U.S. service partners in the following amounts: (1) $135,752,204.42 in 2004; (2) $172,324,597.20 in 2005; and (3) $149,135,299.39 in 2006.  (Defs.' Suppl. Summ. J. Mot., Dosrosers Decl., Ex. D.)  Therefore, Defendants maintain that "the changes in EMC's pass-through services business are completely uncorrelated with the alleged evaporation of Agilsys's revenues, which Agilsys contends began immediately after the closing in May 2005."  (Defs.' Suppl. Summ. J. Mot at 5.)  Accordingly, Defendants assert it is entitled to summary judgment in its favor on Count One because there is no genuine issue of material fact that Plaintiff cannot show causation.

Conversely, Plaintiff argues that summary judgment on Count One is inappropriate because genuine issues of material fact exist regarding the element of causation.  To support its contention that Defendants' misrepresentations and omission caused Plaintiff's harm, it introduces direct testimony from Livingston, EMC's 30(b)(6) representative, that: (1) EMC made a formal decision in 2004 to reduce its overall use of subcontractors in North America; (2) EMC communicated its decision to Defendants; (3) EMC successfully implemented its plan to reduce its use of subcontractors in North America; (4) EMC decreased the subcontracting work it provided to CTS by 60-65% in terms of both revenue and volume; and (5) EMC's reduction of the subcontracting work it provided to CTS was caused by EMC's decision to reduce its use of subcontractors.  (Livington Dep. at 36-49, 63-65, 117, 135-37.)  Plaintiff also argues that the EMC Payment Records are not evidence that EMC reduced its use of North American contractors.  To buttress its argument,

Plaintiff points to the deposition testimony of Lisa Gehling, a Partner Manager of EMC Global Services, who explained that the Payment Summary showed only payments *by* EMC USA, not payments *to* North American subcontractors such as CTS.  Thus, some of the payments could have been made to subcontractors not located in North America.  Moreover, Plaintiff points out payments made by EMC in any given month may reflect subcontracting work performed at a much earlier time.

In light of the conflicting evidence presented by the parties, it is apparent to the court that genuine issues of material fact exist regarding the element of causation.  Accordingly, the court denies Defendants' Motion for Summary Judgment on Count One.

### b. Counts Two (in part), Four, Five, Six, Seven, Nine and Ten

For the same reasons set forth above in Count One, Defendants again argue there is no genuine issue of material fact that Plaintiff was not injured as a result of its reliance upon Defendants'

representations about EMC because EMC increased, rather than decreased, its use of service providers.  Defendants argue that, since there is no genuine issue of material fact regarding proximate causation, they are entitled to summary judgment on the following claims: Count Two in part (fraud); Count Three (negligent representation); Count Four (breach of fiduciary duty); Count Five (unjust enrichment); Count Six (civil conspiracy); Count Seven (aiding and abetting fraud); Count Nine (declaratory judgment); and Count Ten (rescission).

Specifically, Defendants point out that Count Two, the fraud claim, requires that Plaintiff establish that its damages were proximately caused by Plaintiff's justifiable reliance upon Defendants' allegedly false and misleading representations or omissions regarding the EMC Loss.[4]

---

[4]        Plaintiff's fraud claim is primarily based upon the fact that
Defendants allegedly failed to disclose the EMC loss, and this

-12-

*See Bergmoser v. Smart Document Solutions, LLC,* 268 F. App'x 392, 395 (6th Cir. 2008) (citing *Gaines v. Preterm-Cleveland, Inc.,* 514 N.E.2d 709, 712 (Ohio 1987) for the elements of fraud under Ohio law). However, as discussed above, genuine issues of material fact exist regarding causation, and the court therefore denies summary judgment on Count Two.

As Defendants correctly note, Counts Six, Seven, and Ten depend expressly upon the fraud claim, and without the fraud claim, these claims must fail. Yet, the court has held that Plaintiff's fraud claim does not fail because Plaintiff has shown that genuine issues of material fact exist regarding causation, and the court therefore denies summary judgment on Counts Six, Seven, and Ten.

Defendants also contend that Count Three, Plaintiff's claim for negligent misrepresentation related to Defendants' failure to disclose the EMC Loss, essentially repackages the fraud claim under a negligence theory, and that because the fraud claim fails for lack of proximate cause, the court should dismiss the negligent misrepresentation claim as well. (Defs.' Summ. J. Mot. at 18, citing *In re Welding Fume Products Liability Litig.,* No. 1:03 CV 17000, 2007 WL 1087605, at *8 (N.D. Ohio April 9, 2007) (granting the defendant summary judgment on negligent misrepresentation where plaintiff cannot prove alleged representation proximately caused injury). Inasmuch as the court has held that Plaintiff has produced sufficient evidence that a genuine issue of material fact exists regarding the proximate causation element on Counts One and Two, the court therefore denies Defendants' Summary Judgment Motion on Count Three.

---

allegation is discussed in this section. However, Plaintiff also bases its fraud claim in part upon its allegation that Defendants falsely represented that certain of CTS's accounts receivable were collectible. The court addresses this ancillary allegation below in Section I(C)(1)(c).

Defendants also argue that they are entitled to summary judgment on Counts Four and Nine, for breach of fiduciary duty and declaratory judgment, respectively.  Defendants argue that Count Four is based upon the fact that Defendants allegedly failed to disclose the EMC Loss, which they argue did not happen.  However, as discussed above, genuine issues of material fact exist regarding the EMC Loss, and the court therefore denies summary judgment on Count Four.  Similarly, Defendants argue that Plaintiff terminated Gordon's employment with cause because of "deceptive acts" relating to the EMC Loss, and since the EMC Loss did not occur, Count Nine should be dismissed.  The court denies Defendants' Motion with respect to Count Nine because genuine issues of material fact exist regarding the EMC Loss.

Finally, Defendants argue that the court should grant Defendants summary judgment on Count Five, unjust enrichment, because Plaintiff cannot establish the retention of a benefit by Defendants under circumstances where it would be unjust to do so without payment.  Again, Defendants argue that Plaintiff cannot establish this element because EMC's business actually increased after the closing, and it would not be unjust for Defendants to retain the benefit of their $28 million bargain with Plaintiff.  As noted above, genuine issues of material fact exist regarding the causation of the EMC Loss, and the court therefore denies Defendants' Summary Judgment Motion with respect to Count Five.

### c. Count One (in part) and Two (in part)

Plaintiff's Counts One (breach of contract) and Two (fraud) are both premised in part upon its allegation that Defendants made false representations about its $160,000 account receivables on the Daticon invoice in violation of Section 4.7.3 of the Agreement.  Section 4.7.3 of the Agreement made two representations: (1) "the accounts receivable are current and collectible";  and  (2) "there

-14-

is no pending contest, claim, or right of set-off with respect to any such account receivable other than returns, credits, discounts, and customer rebates established in the ordinary course of business consistent with past practice."

Defendants argue they are entitled to summary judgment because: (1) the Daticon invoice was collectible in the ordinary course of business; (2) Plaintiff made no attempt to collect that invoice; and (3) Plaintiff did not make that attempt because it applied an inflexible write-off policy of expensing as a bad debt any invoice that is more than 90 days past. (Krohn Decl.¶¶ 4-10.) Conversely, Plaintiff asserts that Defendants' argument must fail because: (1) Krohn admitted that the Daticon invoice was part of the accounts receivable discussed in Section 4.7.3; (2) Krohn admitted that Daticon had contested $161,000 of the $236,000 debt owed as early as November 2004; and (3) Krohn admitted that CTS never told Plaintiff prior to closing that the invoice was contested.  (Krohn Dep. at 74-76, 81.)

The court finds that Defendants have put forth evidence that the Daticon accounts receivable may have been collectible. However, Plaintiff has put forth evidence, which Defendants do not dispute, that Defendants failed to disclose that EMC had contested the Daticon invoice.  As Plaintiff correctly notes:

> Even assuming *arguendo* that CTS or Agilysys could have subsequently collected on the remainder of the Daticon Invoice, such collection would not alter the fact that CTS knew EMC had contested certain accounts receivable prior to closing and yet told Agilysys the contrary.  The two are apples and oranges.  CTS made separate representations to Agilsysy that the "accounts receivable are current and collectible" and that there were "no pending contest, claim or right of set-off."  The former addresses a subjective prediction of recovery, the latter an objective historical fact. Put into context, though CTS might have believed the Daticon Invoice was collectible in full, it knew as a matter of fact that the Daticon Invoice had been contested.  CTS thus misrepresented known historical facts in breach of the Agreement.

-15-

(Pl.'s Summ. J. Opp'n at 29.)  Accordingly, since Defendants have not set forth any evidence that

no genuine issue of material fact exists with respect to the fact that CTS knowingly misrepresented

that

the Daticon Invoice was contested, the court denies Defendants' Summary Judgment Motion with

respect, in part, to Counts One and Two.

> 2. Plaintiff's Motion for Partial Summary Judgment on the Earn-Out Counterclaim

Defendants filed three counterclaims, alleging: (1) Plaintiff breached the earn-out provision

of the Merger Agreement ("Earn-out Counterclaim"); (2) Plaintiff breached its employment

agreement with Malone; and (3) Plaintiff breached its employment agreement with Gordon.  Plaintiff

only moves for summary judgment on the  Earn-Out Counterclaim.

Defendant Gordon brings the Earn-Out Counterclaim in his capacity as the representative of

CTS's former shareholders and option-holders ("Shareholders") (Counterclaim ¶¶ 1-2.).  It is

undisputed by the parties that APS did not attain the negotiated EBITDA for the 13-month closing

period and that the CTS shareholders, including Defendants, were denied the anticipated Earn-Out

Payment, which could have reached as much as $32 million. The Earn-Out Provision is attached as

Exhibit A to Defendants' Answer and Counterclaim.  Section 2.8.1 of the Earn-Out Provision states

that "the Earn-out Payment will become available if the Combined Business generates operating

income plus depreciation plus amortization ("EBITDA") for the twelve (12) month period

commencing as of the first day of the month immediately following the Closing Date greater than

[$5,250,000]."  Subsections (a) - (e) set forth various thresholds of the Earn-Out Amount.  Section

2.8.2 of the Merger Agreement provides, in pertinent part:

> 2.8.2 EBITDA Determinations and Adjustments.  EBITDA will be determined on a
> consolidated basis (with respect to the Combined Business only) from the financial

statements prepared by Buyer in accordance with GAAP. For purposes of determining EBITDA: (a) actual storage hardware sales by the Combined Business will be limited to 10% of service fees earned by the Combined Business during the Earn-Out Period, (b) no Buyer corporate overhead, intercompany charges, including, without limitation, any additional costs or expenses associated with the Combined Business being a subsidiary of a publicly traded company (e.g. management expenses) will be allocated by Buyer to the business of the Combined Business during the Earn-Out Period, (c) actual expenses relating to personnel changes to the Combined Business, following the Closing Date shall be included in such calculation of EBITDA to the extent such changes are reasonably acceptable to both Buyer and the Shareholders' Representative (it being understood and agreed that if any such expenses are excluded from the calculation of EBITDA then, any revenues associated with such personnel changes shall be excluded from the calculation of EBITDA) and, (d) expenses for all employee plans, policies and procedures, including without limitation those related to severance, health benefits, vacation, sick pay and retirement benefits, (i) with respect to PSG's employees at Closing, shall be fixed at the rates associated with PSG's existing such plans, policies and procedures at Closing and (ii) with respect to all employees of the CTS Group and all new employees of PSG following the Closing, shall be fixed at the rates associated with such existing comparable plans, policies, and procedures of the CTS Group immediately prior to Closing.

Gordon sets forth three general areas in which Plaintiff allegedly breached its purported duty of good faith and fair dealing with respect to the Earn-Out Provision: (1) Plaintiff impeded the operations of CTS (Counterclaim ¶¶ 20-29); (2) Plaintiff failed to educate and incentivize its sales staff to market CTS services (Counterclaim ¶¶ 30-39); and (3) Plaintiff made material misrepresentations on its financial disclosures to CTS that bore directly on their expectations and ability of CTS to attain the Earn-Out thresholds. (Defs.' Counterclaim ¶¶ 40-44.)

Plaintiff makes the following arguments in support of its Motion: (1) Ohio law does not permit an independent claim for breach of an implied covenant of good faith and fair dealing; (2) Ohio courts will not imply a covenant of good faith and fair dealing in a comprehensive and fully-integrated commercial contract; (3) Gordon cannot base the Earn-Out Counterclaim on events that occurred and statements allegedly made prior to execution of the parties' contracts; and (4) Plaintiff

was not obligated to make an Earn-Out payment because the express contingency to that duty, *i.e.,* Combined Business must reach at least $5.25 million, was not satisfied.

In response, Defendants argue: (1) they have not asserted stand-alone good faith claims; (2) their claims are viable, regardless of whether the parties entered into a comprehensive and fully-integrated commercial contract; and (3) the prevention doctrine excuses the undisputed failure of the express contingency.

*a. Law*

1. Good Faith

*i. Good Faith Generally*

Under Ohio law, "[e]very contract has an implied duty of good faith and fair dealing." *Thomas & Marker Constr. Co. v. Wal-Mart Stores, Inc.,* No. 3:06 CV 406, 2008 U.S. Dist. LEXIS 79072, at *64 (S.D. Ohio Sept. 15, 2008) (citing *Littlejohn v. Parrish,* 839 N.E.2d 49, 54 (Ohio Ct. App. 2005). Thus, "a party can be found to have breached its contract if it fails to act in good faith." *Littlejohn,* 839 N.E.2d 54. Yet, "a party does not have a separate cause of action for breach of an implied duty of good faith and fair dealing where a contract exists that governs the relationship between the parties." *Thomas & Marker,* 2008 U.S. Dist. LEXIS 70972, at *64 (citing *Littlejohn,* 839 N.E.2d at 54; *Lakota Local School Dist. Bd. of Educ. v. Brickner,* 672 N.E.2d 578, 584 (Ohio Ct. App. 1996).

Good faith refers to "an implied covenant not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting." *Thomas & Marker,* 2008 U.S. Dist. LEXIS 79072, at *64 (quoting, in part, *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St. 3d 433, 1996 Ohio 194, 662 N.E.2d 1074 (1996)). Thus, "what the duty of good faith consists of depends upon

-18-

the language of the contract which leads to an evaluation of reasonable expectations of the parties."

*Thomas & Marker Constr. Co.,* 2008 U.S. Dist. LEXIS 79072, at *64.

### ii. Good Faith in the Context of an Earn-Out Agreement

Ohio courts have not had occasion to analyze the doctrine of implied good faith in the context of an earn-out agreement. Yet, a review of cases from other jurisdictions that have addressed this issue reveals that the implied covenant is applied "only in narrow circumstances" and cannot be used to either "forge a new agreement" or "impose a free-floating duty." *See, e.g., Hodges v. MedAssets Net Revenue Systems,* No. 1:07-cv-2985, 2008 WL 476140, at *6 (N.D.Ga. Feb. 19, 2008) (internal citations omitted) (applying Delaware law). As one court stated:

> The implied covenant of good faith and fair dealing is not designed to enlarge or create new substantive rights between parties. *Don King Productions, Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990) (Sweet, J.) ("The implied covenant does not, however, operate to create new contractual rights; it simply 'ensures that parties to a contract perform the substantive, bargained-for terms of their agreement' and that parties are not unfairly denied 'express, explicitly bargained-for benefits.'" (quoting *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1516 n.20, 1517 (S.D.N.Y. 1989)); *Murphy v. American Home Products Corp*., 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983) ("No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship.").

*Ferguson v. Lion Holding, Inc.,* 478 F. Supp. 2d 455, 479 (S.D.N.Y. 2007) (applying New York law).

Therefore, various courts facing good faith and fair dealing claims alleging frustration in relation to earn-out provisions have found that the parties' bargained-for agreement did not permit the implication of additional terms. *Ferguson,* 478 F. Supp. 2d at 479-80 (rejecting a seller's breach of contract and good faith and fair dealing claims because the sellers were "attempting to create new contractual rights that they did not previously bargain for"); *LaFleche v. Clark Prods.,* No. 5-2589, 2007 U.S. Dist. LEXIS 53568 (D. Minn. July 9, 2007) (granting summary judgment in favor of buyer

on seller's good faith and fair dealing claim, finding that the seller "cannot use the covenant of good faith and fair dealing to create new, specific contract terms that he simply wished had been included in the [Agreement]"); *Rumis v. Brady Worldwide, Inc.,* No. 05cv1758, 2007 U.S. Dist. LEXIS 37190, at *25-26 (S.D. Cal. May 21, 2007) granting summary judgment in favor of buyer on seller's good faith and fair dealing claim, finding that "without a clear indication in the parties' Agreement that the parties intended to obligate [buyer] to market the products, the court cannot hold [buyer] liable for failing to do so.  In sum, after examining the earn-out provisions and the employment agreements, the Court finds that no reasonable trier of fact could conclude that it is clear from the parties' Agreement that they would have agreed" to the obligation seller sought to impose through an implied covenant of good faith and fair dealing."); *Terra Venture, Inc. v. JDN Real Estate,* 340 F. Supp. 2d 1189 (D. Kan. 2004) (granting summary judgment against breach of contract and good faith and fair dealing claims based on alleged frustration of plaintiff's earn-out payments, rejecting the plaintiff's arguments that defendant breached an implied covenant of good faith and fair dealing by failing to timely develop certain property because the parties' agreement did not contain an express or implied promise by defendants to timely develop the land, even though payment of the earn-out was contingent upon timely development, and the agreement provided that "time was of the essence," since the agreement made clear the earn-out was merely "potential.").  *But see O'Tool v. Genmar Holdings, Inc.,* 387 F.3d 1188, 1197 (10th Cir. 2004) (holding there was compelling evidence regarding the buyer's bad faith and ulterior economic motives to support the breach of an implied covenant of good faith and fair dealing of the earn-out provision).

## 2. Integration Clause

It is a well-established principle of contract interpretation that:

> In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties. The general rule is that contracts should be construed so as to give effect to the intention of the parties. Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions. Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence.

*Aultman Hosp. Ass'n v. Community Mut. Ins. Co.,* 544 N.E.2d 920, 923 (Ohio 1989) (internal citations omitted).  Thus,  "[a] written contract which appears to be complete and unambiguous on its face will be presumed to embody the final and complete expression of the parties' agreement." *DavCo Acquisition Holding, Inc. v. Wendy's Int'l,* No. 2:07 CV 1064, at *16 2008 U.S. Dist. LEXIS 27108, at *16 (S.D. Ohio March 18, 2008) (citing *Fontbank, Inc. v. CompuServe, Inc.,* 742 N.E.2d 674 (Ohio Ct. App. 2000)).  Significantly, "this presumption is strongest where a written agreement contains a merger or integration clause expressly indicating that the agreement constitutes the parties' complete and final understanding regarding its subject matter." *Id.*  Thus, in the context of a good faith claim relating to an earn-out provision, one court found that "[t]he existence of an integration clause in the Agreement further supports the conclusion that Defendant was not obligated to market [the seller's] products," one of the bases upon which the seller claimed the buyer had breached its duty of good faith and fair dealing. *Rumis,* 2007 U.S. Dist. LEXIS 37190, at *24.

However, writings executed as part of the same transaction should be read together as a whole. (Defs.' Opp'n at 14, citing *Panagouleas Interiors, inc. v. Silent Partner Group, Inc.,* No. 18864, 2002 WL 441409, at *10 (Ohio Ct. App. Mar. 22, 2002) (quoting *Edward A. Kemmler Mem'l Found. v. 691/733 East Dublin-Granville Road Co.,* 584 N.E.2d 695, 698 (1992); *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.,* 678 N.E.2d 519, 526 (Ohio 1997); *Abram & Tracy, Inc. v. Smith,* 623 N.E.2d 704, 708 (Ohio Ct. App. 1993). *See also Rumis,* 2007 U.S.

Dist. LEXIS 37190, at *25-26 (analyzing the seller's good faith and fair dealing claim by examining the earn-out provisions of the merger agreement and separate employment agreement).

### 3. Failure of Condition Precedent

The elements of a breach of contract under Ohio law are: (1) the existence of a binding contract agreement; (2) one party performed his contractual obligation; (3) the other party failed to fulfill its contractual obligations *without legal excuse*; and (4) one party suffered damages as a result of the breach.  *Hicks v. Bryan Med. Group, Inc.,* 287 F. Supp. 2d 795, 803 (N.D. Ohio 2003) (citing Ohio law) (emphasis added).  The failure of a condition precedent constitutes a legal excuse for non-performance under Ohio law.  *See Troha v. Troha,* 663 N.E.2d 1319, 1323-24 (Ohio Ct. App. 1995) (citing *Mumaw v. W. & S. Life Ins.,* 119 N.E. 132 (Ohio 1919)).  A condition precedent is an occurrence that "must take place before a duty of performance of a promise arises."  *See id.*

### 4. Prevention Doctrine

The prevention doctrine provides that a contractual party is liable for causing the failure of a condition precedent to its own performance:

> [W]here the obligations of a contract have attached, and one party, without the consent of the other, does some act or makes some new arrangement which prevents the carrying out of the contract *according to its terms*, he cannot avail himself of this conduct to avoid his liability to the other party in contract.

*Suter v. Farmers' Fertilizer,* 126 N.E.304, 306 (Ohio 1919) (emphasis added).

### b. Analysis

Plaintiff argues that a review of the Earn-Out Counterclaim shows that Defendants impermissibly seek to assert a stand-alone good faith claim, citing the following provisions of Defendants' Earn-Out Counterclaim to support this assertion: ¶ 2 (stating the counterclaim is "for breach of [the] Merger Agreement . . . and in particular, the Earn-Out Provisions of the Merger

Agreement" where "Agilysys breached its covenant of good faith and fair dealing); ¶ 16 ("The Agreement's Earn-Out Provisions contain an implied covenant of good faith and fair dealing."); ¶ 18 ("the duty of good faith and fair dealing compels Agilysys to effecutate the intentions of the parties ..."); ¶ 19 ("By virtue of the covenant of good faith and fair dealing Agilysys cannot exercise authority to frustrate the terms of the Earn-Out Provisions."); ¶ 44 ("Agilysys breached its duty of good faith and fair dealing."  (Pl.'s Reply at 4-5, n.3).  Plaintiff then argues that Ohio law does not recognize an independent good faith claim.

Applying the legal principles set forth above to Defendants' Counterclaim, the court does not find that Defendants' Earn-Out Counterclaim is a stand-alone good faith claim, which is impermissible under Ohio law.  Rather, the court construes Defendants' Earn-Out Counterclaim as part of a breach of contract claim, in that Defendants allege in the Earn-Out Counterclaim that Plaintiff breached the implied duty of good faith inherent in the Merger Agreement, which governs the relationship between Plaintiff and Defendants with respect to the Earn-Out Provision.  *See Littlejohn v. Parrish,* 839 N.E.2d 49, 54 (Ohio Ct. App. 2005) ("We hold that a party can be found to have breached its contract if it fails to act in good faith."). With this framework in mind, the court turns to examining each of the general areas upon which Defendants base their Earn-Out Counterclaim.

### i. Allegation that Plaintiff Impeded CTS's Operations

Gordon states, with regard to the first general area of the Earn-Out Counterclaim, that Plaintiff violated its duty to act in good faith with respect to the Earn-Out Provision by depriving Gordon and Malone of the "full latitude to manage, absent gross or willful misconduct, and subject to the reasonable supervision and oversight by Agilysys management," in violation of the Employment

Agreement.  (Counterclaim ¶¶ 20-29.)  Therefore, by allegedly violating this term of the Employment Agreements, which were executed the same day as the Merger Agreement and are attachments to the Merger Agreement, Defendants argue that Plaintiff violated its implied duty of good faith with respect to the Earnout Provision of the Merger Agreement.

Defendants argue that the Merger Agreement and Employment Agreements, as Exhibits to the Merger Agreement, should be read together since they are writings executed as part of the same transaction and should therefore be interpreted as a whole. *Panagouleas Interiors, Inc. v. Silent Partner Group, Inc.,* No. 18864, 2002 WL 441409, at *10 (Ohio Ct. App. Mar. 22, 2002) (quoting *Edward A. Kemmler Mem'l Found. v. 691/733 East Dublin-Granville Road Co.,* 584 N.E.2d 695, 698 (1992); *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.,* 678 N.E.2d 519, 526 (Ohio 1997); *Abram & Tracy, Inc. v. Smith,* 623 N.E.2d 704, 708 (Ohio Ct. App. 1993).  The court finds this argument is well-taken.  *See also Rumis,* 2007 U.S. Dist. LEXIS 37190, at *25-26 (analyzing the seller's good faith and fair dealing claim by examining the earn-out provision of the merger agreement and separate employment agreements).

However, even when the court reads the two Agreements together, the court does not find any basis to equate an alleged breach of the "full latitude" provision of the Employment Agreements with an alleged breach of the Earn-Out Provision of the Merger Agreement.  There is no evidence that the two provisions are related to or dependent upon each other.  Plaintiff correctly notes that "if the parties intended such a result, they could (or should) have negotiated for a provision in the Merger Agreement specifying that Agilysys would be required to make an Earn-Out Payment to the CTS shareholders if Agilysys failed to abide by the 'full latitude provision of the Employment Agreements." (Pl.'s Mot. for Partial Summ. J. at 16-17.)  Moreover, to the extent that Defendants

argue that firing Malone was an implied breach of good faith with respect to the Earn-Out Provision, this assertion is contradicted by the parties' explicit provision that Malone could be fired with or without case.  (Employment Agreement ¶ 5.)

As discussed above, numerous courts have held in similar earn-out cases that courts cannot vary the terms of a parties' agreement, thereby creating new, specific contractual rights that the parties could have, but did not, bargain for.  Similar to the courts in *Ferguson, LaFleche, Rumis,* and *Terra Venture,* this court finds, after examining the Earn-Out Provision and the Employment Agreements, that there is no basis to conclude that the parties would have agreed that Plaintiff would be required to make an Earn-Out Payment if it breached the "full latitude" provision of the Employment Agreements.  Since the parties did not negotiate such a provision, the sole remedy for breach of the full latitude provision of the Employment Agreements is an action for breach of those Agreements.  Therefore, the doctrine of prevention is inapplicable because Plaintiff did not have a duty to perform this obligation.  Accordingly, the court grants Plaintiff's Partial Motion for Summary Judgment on the first general area upon which Defendants base their Earn-Out Counterclaim.

*ii. Plaintiff Failed to Educate and Incentivize Its Sales Force*

Defendants argue that Plaintiff breached its implied duty of good faith in the Earn-Out Provision by failing to educate and incentivize its sales force.  Defendants argue that Plaintiff breached its duty of good faith by failing to: (1) "institute an incentive program" to encourage its sales staff to market and sell CTS services; (2) set quotas for the sale of CTS services; (3) "compensate its sales staff or set goals for the sale of CTS professional services; (4) "adequately inform it sales staff on how to engage CTS service capabilities; (5) integrate "CTS' professional services within Agilysys' pricing model."  (Defs.' Counterclaim ¶¶ 32-34.)  These are issues that

could have been contemplated at the time of drafting by the parties, but the parties, for whatever reason, chose not to address these post-acquisition operational conditions and integration decisions.

Significantly, Plaintiff notes that "given Agilysys' promise [in Section 2.8.2(c) of the Agreement] to adjust the Earn-Out calculation to account for the anticipated adverse impact [that] integration and operational decisions might have on the attainment of the Earn-Out, Agilysys could not have been expected that it also had implicitly promised to, among other things," perform the actions described above in Defendants' Counterclaim and set forth in the paragraph above. The court finds that Plaintiff's argument is well-taken. As stated above, numerous courts have refused to impose terms upon the parties when there is no evidence the parties could have, but did not, bargain for such terms. Moreover, the court finds that the existence of an integration clause in the Agreement further supports the conclusion that Plaintiff was not obligated and did not undertake these additional obligations. *See Rumis,* 2007 U.S. Dist. LEXIS 37190, at *24.

In line with the decisions in *Ferguson, LaFleche, Rumis,* and *Terra Venture,* this court finds, after examining the Earn-Out Provision, that Defendants are impermissibly attempting to create new contractual rights that the parties did not bargain for. Therefore, the doctrine of prevention is inapplicable because Plaintiff did not have a duty to perform this obligation. Accordingly, the court grants Plaintiff's Partial Motion for Summary Judgment on the second general area upon which Defendants base their Earn-Out Counterclaim.

### iii. Plaintiff Misrepresented Its Financial Information

In Malone's opposition brief to Plaintiff's Motion for Partial Summary Judgment on the Earnout Claim, he asserts that Plaintiff breached Section 5.8 of the Agreement, which states, in

pertinent part, that: "[t]he financial information of PSG previously provided to [CTS] by [Agilysys]:

is (a) true, correct, and complete in all material respects. ..." Plaintiff asserts in its Reply that it

"objects to Gordon's attempt to amend his pleadings without leave of the Court and proceed on a

different claim than he alleged in the Earn-Out Counterclaim and identified in discovery..." (Pl.'s

Reply at 7.)  Defendants, apparently anticipating Plaintiff's objections on this ground, maintains in

a footnote that "[t]he shareholders were not required to identify Section 5.8 in the First Counterclaim

as the contract provision that Agilysys breached."  (Defs.' Opp'n at 16, n.2, citing *New Hampshire

Ins. Co. v. MarineMax of Ohio, Inc.,* 408 F. Supp. 2d 526, 529 (N.D. Ohio 2006); *Webb v. Chase

Manhattan Mtge. Corp.,* No. 2:05 CV 548, 2007 WL 709335, at *5-6 (S.D. Ohio Mar. 5, 2007).

However, the court notes that *New Hampshire* and *Webb* are distinguishable from the facts here

because those courts found that the plaintiff had provided the defendants with sufficient notice

regarding the nature of their claims.

The court notes that Section 5.8 of the Agreement was not referenced in the Agreement, nor

was it attached as an exhibit to the Counterclaim.  Yet, Defendants attached the Earn-Out Provision

of the Agreement and the Employment Agreements as Exhibits to the Counterclaim.  After reviewing

¶¶ 40-44 of Defendants' Counterclaim titled, "Agilysys Misrepresents Its Financials," the court finds

that the allegations set forth do not provide Plaintiff with any notice that Defendants have alleged that

Plaintiff expressly breached Section 5.8 of the Merger Agreement.  Indeed, after setting forth its

allegations of Plaintiff's alleged financial misrepresentation, Defendants allege that: "Agilysys's

actions thus deprived CTS shareholders and optionholders of the right to receive the fruits of their

earn-out provisions.  As such, Agilysys breached its duty of good faith and fair dealing."  (Defs.'

Counterclaim ¶ 44.)  Accordingly, the court finds that Defendants are attempting to amend ¶¶ 40-44 of their Counterclaim to assert an express breach of contract claim without leave of the court.

Pursuant to Rule 15(a), Defendants may amend at this stage of the proceedings only after obtaining the court's leave, and Defendants have not sought such leave. Significantly, "although the Rule provides that 'leave of court shall be freely granted when justice so requires,' leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party." *Needham v. Roho Group*, 2007 U.S. Dist. LEXIS 12553, at *32  (E.D. Mich. Feb. 1, 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182, (1962); *Duggins v. Steak & Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997)). Moreover, "[n]otice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Needham,* 2007 U.S. Dist. LEXIS 12553, at *32 (citing *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001)).  Bearing these principles in mind, even if the court were to construe Defendants' Opposition Motion as a request for leave to amend the Earn-out Counterclaim, such a Motion would not be well-taken at this late stage.

However, to the extent that Defendants argue that Plaintiff breached its duty of good faith and fair dealing inherent in the Earn-Out Agreement by misrepresenting its financial information, the court denies Plaintiff's Motion for Partial Summary Judgment.  The court finds that, unlike the factual circumstances in *Ferguson, LaFleche, Rumis,* and *Terra Venture,* where those courts concluded that the sellers were attempting to enlarge or create new substantive contractual rights in the parties' agreements, Plaintiff in the instant action had an implied good faith duty to provide Defendants with proper financial information so that Defendants had a fair opportunity to receive the

-28-

benefit of their bargain with respect to the Earn-Out Provision.  To the extent that Defendants can show that Plaintiff's misrepresentation was a breach of its duty of good faith, Defendants can proceed on that claim at trial, provided they can show that this misrepresentation prevented them from receiving an Earn-Out payment.  Moreover, in line with the court's finding that Plaintiff had the duty to not misrepresent its financial information, the prevention doctrine also buttresses the court's holding denying Plaintiff's Partial Summary Judgment Motion on this ground.

## II.  PLAINTIFF'S MOTIONS TO STRIKE

Plaintiff moved to strike portions of the declarations of Defendants Malone and Gordon in support of Defendants' Summary Judgment Motion and in opposition to Plaintiff's Motion for Partial Summary Judgment.  Plaintiff argues that the disputed statements: (1) consist of inadmissible hearsay; and/or (2) consist of improper opinions and testimony for which there is no foundation establishing that Malone has personal knowledge; and (3) refer to documents that are not provided to the court.  The court did not find it necessary to rely on the disputed statements to reach its holdings in this Order, and the court therefore denies as moot Plaintiff's Motions to Strike.

## III. CONCLUSION

For the reasons stated above, the court: (1) denies Defendants' Motion for Summary Judgment (ECF No. 86); (2) grants Plaintiff's Motion for Summary Judgment on the Earn-Out Counterclaim in part and denies it in part (ECF No. 88); (3) denies Plaintiff's First and Second Motions to Strike Portions of the Declarations of Defendants Malone and Gordon (ECF Nos. 95, 124); and (4) grants Defendants' Motion for Leave to File *Instanter* Corrected Exhibit to Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 106.)

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

December 10, 2008